ORIGINAL

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Hawaii

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 13 2020

at _3_o'clock and _00_min._ _M
MICHELLE RYNNE, CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| ALEXANDER YUK CHING MA | ) | 20-001016 DKW-RT |
| KS | ) | |
| | ) | |
| _____ | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___between 3/2001 and 11/2010___ in the county of _____Honolulu_____ in the

_____ District of ___Hawaii and elsewhere___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 794(a) and (c) | Conspiracy to Gather and Communicate National Defense Information of the United States to a Foreign Nation |

This criminal complaint is based on these facts:

See Attached Affidavit of FBI Special Agent Chris Jensen

☐ Continued on the attached sheet.

_____
Complainant's signature

FBI SA Chris Jensen
Printed name and title

Sworn to before me and signed in my presence.

Date: ___08/13/2020___                       _____
Judge's signature

City and state: _____Honolulu, Hawaii_____      Derrick K. Watson, United States District Judge
Printed name and title

FILED
BY ORDER OF THE COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | CR. NO.  20-001016 DKW-RT |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | AFFIDAVIT OF CHRIS JENSEN |
| ALEXANDER YUK CHING MA | ) | |
| | ) | |
| | ) | |

## **AFFIDAVIT OF FBI SPECIAL AGENT CHRIS JENSEN**

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have been so employed since 2012. I am currently assigned to the Honolulu Field Office of the FBI. Since May 2013, I have been assigned to a Counterintelligence squad where my primary responsibility is the investigation of matters involving foreign counterintelligence. I have completed FBI training in foreign counterintelligence matters, which has included training in criminal violations associated with espionage. I have also worked extensively with representatives of other U.S. intelligence agencies on matters related to foreign counterintelligence. In the course of my career, I have participated in the service of multiple federal search warrants relating to counterintelligence investigations. I have led many counterintelligence investigations, including those related to

1

espionage matters. In 2017, I received an award from the U.S. Department of Defense related to a counterintelligence investigation where I served as the FBI's lead investigator. I have received specialized training on the tactics, methods, techniques, and tradecraft of persons disclosing classified information in an unauthorized manner. In addition, I have worked collectively on this investigation with multiple FBI agents and analysts who possess many years of experience in counterintelligence investigations such as the one described in the affidavit. As a result of the background, training, and experience, of both myself, and the other agents with whom I am collectively working on this investigation, I am familiar with tactics, methods, techniques, and tradecraft of foreign intelligence services and their agents, as well as persons who may be acting in violation of U.S. laws forbidding espionage activity as well as persons disclosing classified information in an unauthorized manner.

2.      The statements contained in this affidavit are based, in part, on information gathered through court-authorized search and surveillance processes, my own personal observations and review of audio and video recordings made during the conduct of the investigation, information provided by other government agencies that your affiant has found to be reliable, and conclusions reached by me based upon my training and experience as an FBI Special Agent. Because this affidavit is being submitted for the limited purpose of securing authorization for

the execution of an arrest warrant, I have not included each and every fact known to me concerning the investigation. I have set forth only the facts that I believe are necessary to establish the necessary foundation supporting issuance of the requested process.

ALEXANDER MA

3.     Alexander Yuk Ching MA ("MA"), age 67, is a naturalized United States citizen who resides in Honolulu, Hawaii. He was born in Hong Kong in 1952 and came to Honolulu, Hawaii, in or about 1968, where he finished primary school and attended the University of Hawaii at Manoa.

4.     MA joined the Central Intelligence Agency ("CIA") in 1982. In 1983, MA was assigned as a CIA officer overseas. As a CIA officer, MA held a TOP SECRET security clearance and had access to classified national defense information of the United States. In addition to his TOP SECRET clearance, MA had access to Sensitive Compartmented Information ("SCI"). This access included the identities of covert CIA officers; the identities of clandestine human sources; details of sensitive intelligence collection operations and methods; details of CIA clandestine training; cryptographic information related to CIA communications; and details of clandestine tradecraft the CIA employs to avoid detection by hostile foreign intelligence services. As a CIA officer, MA was trained in methods of covert communication, surveillance detection, and operational security, for

3

purposes of conducting authorized intelligence activities for the United States. In

1989, MA resigned from the CIA.

5.      According to records provided by U.S. Customs and Border

Protection ("CBP"), when MA arrived in Honolulu on November 24, 2000, he told

CBP agents during a secondary inspection that he had been residing in China for at

least the previous five years and that he was an "importer and exporter." MA was

carrying $9,000 cash in U.S. currency.

COCONSPIRATOR #1

6.      Coconspirator #1 ("CC#1"), age 85, is a naturalized United States

citizen who resides in Los Angeles, California. CC#1 was born in Shanghai,

People's Republic of China ("PRC"), and came to the United States in 1961. CC#1

is related by blood to MA. CC#1 joined the CIA in 1967 and worked as an officer

from 1971 to 1982. For multiple years during CC#1's CIA employment, CC#1 was

assigned overseas. As a CIA officer, CC#1 held a TOP SECRET security clearance

and had access to classified national defense information of the United States. In

addition to CC#1's TOP SECRET clearance, CC#1 had access to SCI. This access

included the identities of covert CIA officers; the identities of clandestine human

sources; details of sensitive intelligence collection operations and methods; details

of CIA clandestine training; cryptographic information related to CIA

communications; and details of clandestine tradecraft the CIA employs to avoid

4

detection by hostile foreign intelligence services. As a CIA officer, CC#1 was trained in methods of covert communication, surveillance detection, and operational security, for purposes of conducting authorized intelligence activities for the United States.

7.      In 1983, CC#1 resigned from the CIA after it was determined CC#1 was inappropriately using CC#1's official position to assist PRC nationals in obtaining entry into the United States. After ending employment with the CIA, CC#1 resided in Los Angeles, California. In or about 1998, CC#1 was convicted on two (2) counts of violating 18 U.S.C. § 1014 (False Statement to a Lending Institution).

8.      The FBI investigation into CC#1 has revealed that CC#1 currently suffers from an advanced and debilitating cognitive disease. Due solely to CC#1's present cognitive issues we do not seek an arrest warrant for CC#1 at this time.

## THE CENTRAL INTELLIGENCE AGENCY

9.      The CIA is a U.S. government intelligence agency with various offices, and is a component of the United States Intelligence Community. The CIA is responsible for, among other things, collecting (including through clandestine means), producing, and disseminating foreign intelligence and counterintelligence used to inform U.S. policy makers; conducting counterintelligence activities; conducting administrative and technical support activities; conducting covert

action activities approved by the President; and conducting foreign liaison

relationships with intelligence and security services of foreign governments. The

collection of foreign intelligence is, in part, done through the use of sources or

assets. Sources or assets are people who agree to help a foreign intelligence service

by providing information to that service in response to tasking from foreign

intelligence officers or agents.

CHINESE INTELLIGENCE SERVICES AND ASSOCIATED TERMS

10.     The PRC intelligence services encompass both the civilian and

military components of Chinese intelligence programs. The Ministry of State

Security ("MSS") handles civilian intelligence collection and is responsible for

counterintelligence and foreign intelligence, and well as political security. The

MSS consists of a central ministry, provincial state security bureaus, and municipal

state security bureaus. The Shanghai State Security Bureau ("SSSB") is a

provincial state security bureau charged with collecting intelligence within the

geographic region surrounding Shanghai. Because the SSSB reports directly to the

MSS, and is a department thereof, MSS and SSSB will be collectively referred to

in this affidavit as the MSS.

11.     Among other things, the MSS is tasked with collecting intelligence

information that would be of value to the PRC's political, economic, and national

security, and actively recruits human intelligence sources in order to gather

intelligence information and state secrets of foreign countries. The MSS operates in part through the use of intelligence officers ("IOs") who focus their attention on conducting clandestine and overt human source operations to gather intelligence information. The United States is a primary target of the MSS intelligence gathering mission.

CLASSIFIED INFORMATION

12.    Pursuant to Executive Order 12958 signed on April 17, 1995, as amended by Executive Order 13292 on March 25, 2003, and Executive Order 13526 on December 29, 2009, national security information is classified as "TOP SECRET," "SECRET," or "CONFIDENTIAL." National security information is information owned by, produced by, produced for, and under the control of the United States government that is classified as follows:

a.  Information is classified as TOP SECRET if the unauthorized disclosure of that information reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is able to identify and describe.

b.  Information is classified as SECRET if the unauthorized disclosure of that information reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify and describe.

    c.   Information is classified as CONFIDENTIAL if the unauthorized

disclosure of that information reasonably could be expected to cause

damage to the national security that the original classification

authority is able to identify and describe.

13.    Access to national security information classified at any level can be

further restricted through designation in SCI categories. Only individuals with the

appropriate security clearance and additional SCI permissions can have authorized

access to such classified national security information.

14.    Information classified at any level can only be lawfully accessed by

persons determined by an appropriate United States government official to be

eligible for access to the classified information and to have a "need to know" the

classified information. Classified information should only be stored in an approved

facility and container.

<u>SECURITY CLEARANCES</u>

15.    Both MA and CC#1 worked during their CIA careers in the East-Asia

and Pacific region. Both MA and CC#1 held U.S. security clearances at the TOP

SECRET//SCI level and had access to a broad range of highly sensitive classified

material.

16.    Because MA and CC#1 held security clearances, the U.S. government

entrusted them with access to sensitive government materials, including classified

8

documents and materials and information relating to the national defense that was closely held by the government.

17.    Throughout their careers, as a prerequisite to their access to classified information, MA and CC#1 signed several nondisclosure agreements in which they acknowledged both the harm that could result from the unauthorized disclosure of classified information and the applicability of criminal penalties should they make in violation of their security oaths disclosures of such information to persons not authorized to receive it.

## APPLICABLE LAW

18.    Title 18, United States Code, Section 794(a) provides:

Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government . . . or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life[.]

Title 18, United States Code, Section 794(c) makes it a crime to conspire to violate Section 794(a).

## PROBABLE CAUSE

19.    The FBI's investigation has revealed that beginning at least by early 2001, former CIA officer MA became a compromised asset of the MSS. The investigation has revealed that beginning on March 24, 2001, and continuing through March 26, 2001, MA and former CIA officer CC#1 conducted a series of meetings with at least five (5) MSS intelligence officials in a Hong Kong hotel room. During these meetings, MA and CC#1 disclosed a substantial amount of highly classified national defense information of the United States to the MSS officers.

20.    Your affiant has reviewed both audio and video recordings of these March 2001 meetings, and the recordings have also been reviewed by appropriate officials within the CIA. Based on our collective review, it has been determined that during the three days of intensive questioning by MSS intelligence officials, MA and CC#1 voluntarily and knowingly revealed U.S. classified information including, but not limited to, the following subject matters:

      a.  Their CIA work experience and activities;

      b.  Information concerning CIA international operations, including the cover used by CIA officers and CIA activities;

      c.  Cryptographic information used in classified and sensitive CIA communications and reports;

      d.  Information concerning the internal structure and organization of the CIA;

     e.  Information concerning CIA officer identities;

     f.  Information concerning CIA human assets;

     g.  Information concerning CIA use of operational tradecraft;

     h.  Information concerning CIA technical departments;

     i.  Information concerning CIA secure communication practices; and

     j.  Information concerning CIA staffing practices.

21.    Your affiant has reviewed a videotape of the March 26, 2001 meeting between MA, CC#1, and the MSS officers. MA identified important aspects of the tape, such as location, people present, and topics discussed, during an FBI undercover operation described later in this affidavit. The videotape and accompanying audio depict MSS officials paying MA and CC#1 $50,000 in U.S. currency, which MA counted while CC#1 continued to provide classified information to the MSS officers attending the meeting.

22.    Following the March 2001 Hong Kong meetings, MA continued to remain in contact with MSS officials and to work on their behalf. The investigation has revealed that as a mechanism to once again give himself access to U.S. government information, MA applied for employment with the FBI. On December 26, 2002, MA applied with the FBI for the position of "Special Agent." On or about December 30, 2002, after being advised by the FBI that he did not meet the

age requirements for the FBI Special Agent position, MA submitted an online job application to the FBI for a "contract linguist/monitor/tester" position.

23.    On or about April 14, 2003, MA submitted a written application for a contract linguist position, in Chinese languages, at the FBI Honolulu Field Office, in Honolulu, Hawaii. On or about April 21, 2003, MA used a prepaid calling card to call his MSS handlers to notify them of the status of his efforts to gain FBI employment.

24.    On or about May 20, 2004, MA was notified that his background investigation for the contract linguist position was complete and that an employment contract would be ready for review in several weeks. MA agreed to continue the hiring process.

25.    On or about August 10, 2004, one day before reporting to work with the FBI, MA telephoned a suspected accomplice and stated that he would be working for "the other side."

26.    On or about August 11, 2004, MA reported to work with the FBI to begin employment and acknowledged with his signature on an FBI nondisclosure agreement his understanding of the secrecy requirements of his employment with the FBI, including secrecy concerning his FBI work product and materials provided to him. The nondisclosure agreement specifically cautioned him that

federal criminal laws prohibited the unlawful gathering and disclosure of such materials. In the nondisclosure agreement, MA acknowledged, "I understand the need for this secrecy agreement; therefore, I agree that I will never divulge, publish, or reveal either by word or conduct, or by other means of disclosure, to any unauthorized recipient without official written authorization by the Director of the FBI or his delegate, any information from the investigatory files of the FBI or any information relating to material contained in the files, or disclose any information or produce any material acquired as a part of the performance of my contract . . . ."

27.    On or about August 11, 2004, during a security briefing the FBI conducted with MA, the FBI advised MA that because he was working in a controlled security environment designed for the storage of classified materials, he could not use any personal devices, including laptop computers, cellular telephones, personal digital assistants, digital cameras, or removable media, to perform his duties, including translating materials or storing FBI information. Additionally, the FBI instructed MA that he was never to remove any document or digital material from the secure FBI workspace. Your affiant knows from his years of work in FBI secure spaces that all employees and contractors are trained and instructed on the importance of security protocols, including the prohibition against

bringing photographic equipment, digital media, and mobile devices into secure space designed for the handling, storage, and discussion of classified information. As a former employee of the CIA, MA was instructed on the protocols and procedures regarding devices that could not be brought into secure workspaces. In addition, MA also understood that he could not depart secure workspaces with classified information unless specifically authorized to do so.

28.    In August 2004, MA began work for the FBI Honolulu Field Office as a Chinese languages contract linguist. As a part of his employment, MA understood he would have access to classified U.S. national defense information. The investigation has revealed that between in or about August 2004 and in or about November 2010, MA regularly gathered documents marked with U.S. classification markings from the secure FBI workspace with the intent to provide them to his MSS handlers during regular trips he made to China.

29.    On or about September 8, 2004, while working in the secure FBI workspace, MA used his assigned FBI computer to "burn" onto a CD-ROM disc digital photographic images of documents related to guided missile and weapons system technology research.

30.    On or about July 27, 2005, in violation of FBI policy and the security protocols upon which he had been instructed, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

14

31.    On or about August 18, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

32.    On or about August 22, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

33.    On or about August 26, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

34.    On or about September 6, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

35.    On or about September 12, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

36.    On or about September 16, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

37.    On or about October 3, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

38.    In or about February 2006, MA exchanged several e-mail messages and phone calls with MSS IOs. In the exchanges, they discussed MA's upcoming travel plans to Shanghai in late February 2006. The MSS officers told MA they would book MA's hotel and pick him up from the airport.

39.    On or about February 17, 2006, MA departed Honolulu, Hawaii for Shanghai, PRC via Narita International Airport in Tokyo, Japan.

40.     On or about February 23, 2006, MA returned to the Honolulu
International Airport, arriving from Tokyo following his travel in Shanghai.
During Customs screening, CBP agents interviewed and searched MA. During the
interview, CBP determined that MA was in possession of $20,000 in U.S.
currency. In addition, MA had a set of golf clubs he did not previously own.

41.     On or about February 23, 2006, MA forwarded two e-mail messages
from his personal e-mail account to the MSS. The first e-mail message contained
information regarding classified CIA activities. The second e-mail message was an
e-mail message MA had received from a Taiwanese diplomatic official.

42.     On or about February 27, 2006, MA sent CC#1 an e-mail message to
advise CC#1 that MA was going to forward to CC#1 photographs of suspected
human sources that MSS operatives wanted CC#1 to identify.

43.     On or about March 2, 2006, MA telephoned CC#1 at the request of
the MSS to inquire with CC#1 as to the identities of the persons in the photographs
sent to MA by the MSS, which MA in turn sent to CC#1. CC#1 agreed to provide
MA and the MSS with the identities of the individuals in the photographs.

44.     On or about March 6, 2006, MA received an e-mail message from the
MSS with an attachment consisting of one photo of five puppies sitting on a park
bench. The FBI assesses that this photograph was sent in order to prompt MA to

arrange for CC#1 to provide identity information on five (5) individuals who had been suspected human sources.

45.     On or about March 16, 2006, MA possessed at his residence a digital memory card with photographs of five (5) individuals, one (1) picture of a piece of paper with names written in Chinese labeled "a" through "e," and eight (8) photographs of a document that had been removed from the secure FBI workspace.

46.     On or about March 28, 2006, CC#1 sent an email message to MA wherein CC#1 identified two of the five individuals depicted in the photographs provided by the MSS.

47.     On or about May 31, 2006, MA arranged for his wife to fly to Shanghai, PRC. The FBI assesses that one purpose of this trip was for MA's wife to meet with MA's MSS contacts, and the investigation has revealed that MA's wife likely delivered a laptop computer to the MSS during this trip.

48.     On or about June 10, 2006, one of MA's MSS handlers sent MA an email message thanking him for sending his wife and delivering "the present."

49.     On or about June 16, 2006, MA departed Honolulu for Hong Kong for the purpose of meeting with his MSS handlers.

50.     On or about July 15, 2006, MA returned to Honolulu from China and declared $7,000 in U.S. currency to CBP at the Honolulu International Airport.

51.     On or about May 2, 2007, MA photocopied and removed copies of translation documents from the secure FBI workspace.

52.     On or about October 24, 2007, MA photocopied and removed copies of translation documents from the secure FBI workspace.

53.     On or about March 27, 2008, MA photocopied and removed copies of translation documents from the secure FBI workspace.

54.     On or about May 8, 2008, MA photocopied and removed copies of translation documents from the secure FBI workspace.

55.     On or about June 2, 2008, one of MA's MSS handlers telephoned MA and said his "company" would have a lot of work orders this year.

56.     On or about August 15, 2008, one of MA's MSS handlers telephoned MA and reminded MA to call him if a "good" opportunity arises.

57.     On or about February 3, 2009, MA photographed and removed documents with classification markings from the secure FBI workspace and removed copies of translation documents from the secure FBI workspace.

58.     On or about April 21, 2009, MA photocopied and removed documents with classification markings from the secure FBI workspace.

59.     On or about December 2, 2009, during a telephone conversation, CC#1 told MA that CC#1 had met with an MSS contact in Yunnan, China during a recent trip to China.

60.     On or about January 14, 2010, MA photographed documents in the secure FBI workspace with his cellular phone.

61.     On or about March 6, 2010, one of MA's MSS handlers telephoned him to discuss meeting in Hong Kong in late March. Approximately one (1) hour after this call, the MSS handler called MA again, and they confirmed MA's travel schedule to Hong Kong. During this call, the MSS handler advised MA that his "leadership" was eager to meet MA.

62.     On or about March 17, 2010, MA boarded a flight from Honolulu to Seoul, South Korea. In his possession as he boarded the flight was a document with "SECRET" classification markings that MA had taken from the secure FBI workspace. In addition, MA possessed a Chinese language document that he had improperly removed from the secure FBI workspace.

63.     On or about March 31, 2010, MA sent one of his MSS handlers an e-mail message requesting "reimbursement" for "business expenses." MA provided the bank account number at a Hong Kong bank for payment purposes.

64.     On or about May 17, 2010, MA received a telephone call from an MSS officer. During the ensuing conversation, the MSS officer apologized for not seeing MA during MA's recent travel to China and extended an invitation to meet in Shanghai in the future. During the call, the MSS officer told MA he should communicate with CC#1 more often and determine if CC#1 would be willing to

discuss their "business venture." In the experience of your affiant, and the collective experience of the other counterintelligence agents with whom I have worked on this investigation, it is not unusual for espionage actors and foreign counterintelligence agents to utilize substitute terminology when discussing their activities. In this investigation, MSS officers commonly used the term "business" to discuss MA's espionage activities conducted on their behalf.

65.     On or about May 19, 2010, MA sent one of his MSS handlers an e-mail message telling the officer he needed money when he was next in Hong Kong.

66.     On or about August 28, 2010, MA received a telephone call from an MSS officer. During the conversation, the MSS officer inquired how "business" was going and invited MA to visit with him in Shanghai, preferably in March 2011.

67.     On or about November 2, 2010, MA inserted a digital storage device into his FBI computer at the secure FBI workspace.

68.     On or about November 23, 2010, MA inserted a digital storage device into his FBI computer at the secure FBI workspace.

69.     On or about November 30, 2010, MA inserted a digital storage device into his FBI computer at the secure FBI workspace.

70.     In January 2019, the FBI conducted an undercover contact with MA.
An FBI Undercover Employee (UCE), posing as a representative of the MSS,
conducted a meeting with MA in MA's Honolulu business office. The UCE
showed MA a copy of the video recording of the March 26, 2001 meeting
described above as a mechanism to convince MA that the UCE truly was employed
by the MSS, and asked MA for assistance in identifying certain parties present
during the March 2001 meetings. The UCE told MA that the UCE was conducting
an investigation on behalf of the PRC government into how MA had been treated,
including the amount he had been compensated, by certain MSS officers.

71.     After seeing the video recording of the March 26, 2001 meeting where
MA and CC#1 provided classified information to the MSS, MA appeared to be
convinced that the UCE truly was a representative of the MSS. MA then told the
UCE that MA had provided classified information to the MSS and that he had
continued to work with some of the MSS officials present in the video recording of
the March 26, 2001 meeting. MA then assisted the UCE in identifying some of the
MSS officials present during the meeting using the videotape. During the meeting
with the UCE, MA verified the authenticity of the video recording of the March
26, 2001 meeting and confirmed that it accurately depicted the persons present
during the meeting, including himself, CC#1 and several MSS officers.



(Screenshot taken from the covert video and audio recording made by the UCE
during the meeting with MA in January 2019.)

72.     On March 13, 2019, the UCE called MA to ask him if he would meet

with him again. MA agreed and met with the UCE. On this occasion, the UCE

provided MA with $2,000 cash in U.S. currency. The UCE told MA the money

was to acknowledge his work on behalf of China. MA accepted the money and

counted it. (See screenshot from UCE video below; see also Exhibit A.) MA told

the UCE that he was willing to continue to help the MSS, and confirmed that he

had provided multiple items of valuable U.S. government information to the MSS

during the time he worked for the FBI.



(MA counting $2,000 provided to him by the UCE as a
"token" of appreciation for his work on behalf of China.)

73.     On August 12, 2020, the UCE met again with MA. On this occasion,

the UCE provided MA with $2,000 cash in U.S. currency contained within a red

envelope. The UCE told MA that the money was from his employer in

appreciation of MA's efforts to assist them. MA accepted the money, counted it,

and placed the envelope containing the money in his pants pocket.

74.     MA told the UCE during the meeting that he wanted "the motherland"

to succeed. The UCE asked MA about his past work with the MSS. MA told the

UCE that: (a) he had already given the MSS all of the information he possessed;

(b) a lot of the information he provided to the MSS was contained on a laptop computer that had been given to him by his MSS handler and that he returned; (c) MA was first approached by the MSS when he was living in China, and that the MSS officer who approached him was direct and open about his affiliation with the Chinese government; and (d) the reason the MSS approached him was to get to CC#1, whose membership in an anti-communist organization was viewed as a threat by the Chinese government.

75.   During the meeting, MA also told the UCE that he was willing to continue to help the Chinese government, possibly as a consultant, but that he would prefer to discuss opportunities after the COVID-19 pandemic has subsided.

//

//

//

//

//

//

//

//

//

76.    Based on the above facts, your affiant asserts that there is probable

cause to believe that MA conspired with CC#1 and multiple PRC intelligence

officers to gather and communicate national defense information of the United

States to the PRC in violation of 18 U.S.C. Sections 794(a) and (c).



Chris Jensen
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this _13th_, day of August, 2020.

DERRICK K. WATSON
United States District Judge
District of Hawaii

25