KENJI M. PRICE #10523
United States Attorney
District of Hawaii

KENNETH M. SORENSON
Chief, National Security
Assistant U.S. Attorney
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, Hawaii   96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
Email:  Ken.Sorenson@usdoj.gov

SCOTT A. CLAFFEE
Trial Attorney
U.S. DOJ, National Security Division

Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | MAG. NO. 20-01016 DKW-RT |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S MEMORANDUM |
| | ) | OF LAW IN SUPPORT OF MOTION |
| vs. | ) | TO DETAIN DEFENDANT |
| | ) | WITHOUT BAIL; CERTIFICATE |
| ALEXANDER YUK CHING MA, | ) | OF SERVICE |
| | ) | |
| Defendant. | ) | |
| | ) | |

GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DETAIN DEFENDANT WITHOUT BAIL

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES .......................................................i

PROCEDURAL HISTORY AND STANDARD OF REVIEW ..............................1

ARGUMENT ..................................................................2

I.      Ma is Charged with an Extremely Serious Offense That Carries the Most
        Severe Penalties Available Under the Criminal Code...................................4

II.     The Weight of the Evidence Against Ma is Substantial.................................6

III.    Ma's Background as an Intelligence Officer and Substantial Foreign Ties
        Make Him a Critical Flight Risk and Considerable Danger to the Country ...8

IV.     Ma's Release Would Pose Acute and Specific Dangers to Our National
        Security ...........................................................................11

V.      COVID-19 Does Not Alter the Underlying Detention Factors....................13

CONCLUSION ...............................................................16

## TABLE OF AUTHORITIES

<u>Case(s)</u>                                                      <u>Page(s)</u>

*United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991)..............................................2

<u>Statutes and Rules</u>

18 U.S.C. § 794.............................................................................................1

18 U.S.C. § 794(a) ........................................................................................4

18 U.S.C. §§ 794(a) and (c)......................................................................1, 3

18 U.S.C. § 3142..........................................................................................1

18 U.S.C. § 3142(e)(1) .............................................................................2, 16

18 U.S.C. § 3142(f)(1)(B).............................................................................1

18 U.S.C. § 3142(f)(2)(A) ............................................................................1

18 U.S.C. § 3142(f)(2)(B).............................................................................2

18 U.S.C. § 3142(g)......................................................................................2

<u>GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DETAIN DEFENDANT WITHOUT BAIL</u>

The United States, through its attorney, Kenji M. Price, United States Attorney

for the District of Hawaii, respectfully submits the following Memorandum of Law

in support of its Motion to Detain Defendant without Bail pursuant to 18 U.S.C.

§ 3142 (Dkt. No. 6).  For all of the reasons set forth below, there is no combination

of conditions that will reasonably assure Defendant's presence at future proceedings

or the safety of the community and he must accordingly be detained.

## PROCEDURAL HISTORY AND STANDARD OF REVIEW

Alexander Yuk Ching Ma (hereafter "Ma") was charged by criminal complaint

on August 13, 2020 with conspiracy to gather and communicate national defense

information of the United States to the People's Republic of China ("PRC"), in

violation of Title 18, United States Code, Sections 794(a) and (c).  (Dkt. No. 1.)  On

August 17, 2020, the Government moved to detain Ma without bail pursuant to Title

18, United States Code, Section 3142(f)(1)(B), because the maximum sentence for a

violation of Section 794 is life imprisonment or, if certain conditions are met, death.

(Dkt. No. 6.)  In addition, the Government contends that there is a serious risk that

Ma will flee.  *See id.*; 18 U.S.C. § 3142(f)(2)(A).  A hearing on this motion is

scheduled for August 20, 2020.

Ma must be detained if this Court finds that no combination of conditions will

reasonably assure his presence at future proceedings or the safety of the community.

*See* 18 U.S.C. § 3142(e)(1).  The government need only prove Ma is a flight risk by a preponderance of the evidence.  *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).  With respect to whether Ma is a risk to the safety of the community, the burden of proof is clear and convincing evidence.  *Id.*  *See* 18 U.S.C. § 3142(f)(2)(B).

For both prongs, the factors the Court must consider are the same: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against Ma; (3) the history and characteristics of Ma; and (4) the nature and seriousness of the danger to any person or the community that would be posed by Ma's release.  *See* 18 U.S.C. § 3142(g).

## ARGUMENT

Ma must be detained because an analysis of all four statutory factors demonstrates that Ma is an extreme flight risk and no conditions short of confinement will both assure his appearance in court and prevent him from endangering our national security while at liberty.  *First*, Ma is accused of systematically committing espionage violations by conspiring to provide highly sensitive, classified information to the PRC.  His conduct continued over the course of many years with regular, clandestine meetings with members of China's intelligence services.  His statutory sentencing exposure is a maximum penalty of death, or in the event death is not sought by the Department of Justice, life imprisonment.  His conduct comprises the most serious breach of national security

2

law possible, a violation of Title 18, United States Code, Section 794(a) and (c), gathering and communicating classified national defense information to an adversary nation for the purpose of aiding that country.

*Second*, the weight of the evidence against Ma is overwhelming.  In a war chest of damning evidence in the possession of the United States is an hour long video of Ma and his principal co-conspirator (both former Central Intelligence Agency ("CIA") officers) providing highly damaging classified information to intelligence officers of China's Ministry of State Security ("MSS").  Ma met with these MSS officials over the course of three (3) days providing a treasure of U.S. intelligence information to them on CIA sources and methods, confidential human sources, coded secret digraph information, and how to read and understand CIA communications.  Ma's potential punishment multiplied by the probability of his conviction gives him an irresistible incentive to flee to a country from whom the United States could not extradite him.

*Third*, Ma and his wife were born in just such a country:  China.  Ma has lived in the PRC before and he speaks multiple dialects of Chinese.  He has family in the PRC.  He has had and may still have bank accounts in the PRC.  The foreign intelligence service with whom Ma is accused of conspiring has every reason to help him escape.  And Ma has special skills he learned in his U.S. government employment that give him a unique ability to circumvent confinement conditions and

3

evade capture.  *Fourth*, Ma's recent behavior demonstrates that he remains ready, willing, and able to continue to betray our Nation's secrets while at large and would have an increased incentive to ingratiate himself with a foreign intelligence service in order to make good his escape.  Finally, nothing about the ongoing COVID-19 pandemic alters this analysis in any way.  Ma should be detained.

## I.   Ma is Charged with an Extremely Serious Offense That Carries the Most Severe Penalties Available Under the Criminal Code

The nature and circumstances of the offense with which Ma is charged support a conclusion both that Ma is a significant flight risk and that he poses a danger to the community.  Ma is charged with conspiring to commit espionage, and the maximum penalty for such an offense is life imprisonment or, under certain circumstances, the death penalty.  *See* 18 U.S.C. § 794(a).  According to the affidavit filed in support of the criminal complaint, Ma and a relative of his who also was a former CIA officer conspired to communicate "a substantial amount of highly classified national defense information" to a group of intelligence officers of the MSS.  (Dkt. No. 1 ¶ 19.)  In March 2001, in exchange for $50,000, Ma and his co-conspirator disclosed to the MSS information about CIA international operations, including the covers for CIA officers and activities; cryptographic information used in classified and sensitive CIA communications and reports; the internal structure and organization of the CIA; the identities of CIA officers and human assets; CIA's staffing practices and technical departments; and CIA's operational tradecraft, including secure communication

4

practices.  (*Id.* ¶¶ 20-21.)  Over the next decade, Ma continued to provide information to the MSS in response to taskings from his intelligence officer handlers. In 2004, Ma began employment with the Federal Bureau of Investigation ("FBI"), during which he routinely photographed, copied, and removed documents containing U.S. classification markings from his secure FBI workspace.  Ma continued to receive cash, gifts, and reimbursement of travel expenses from the MSS in exchange for his espionage activities.

In sum, Ma engaged in an espionage scheme over the course of many years, a serious offense that makes it highly likely he would attempt to flee from prosecution. Again, the maximum penalty Ma would face would be life imprisonment; therefore, there is significant risk that Ma will choose to take his chances in flight rather than spend the rest of his life in prison if convicted.

Additionally, the nature of Ma's offense makes his release a danger to the community.  As discussed more fully below (Section IV, *infra*), Ma worked for the CIA for approximately seven years, and his co-conspirator worked there for approximately sixteen years.  (Dkt. No. 1 ¶¶ 4, 6-7.)  Ma then worked for the FBI for at least six years.  (*Id.* ¶ 28.)  Thus, Ma and his co-conspirator had access to an expansive amount of classified information, and Ma's lengthy conduct as a spy for China demonstrates a willingness to communicate what he knows to foreign intelligence officials in exchange for money.  There is reason to believe that, when

5

facing such a serious charge and severe potential penalties, Ma would choose to commit further acts of espionage in exchange for assistance from a foreign adversary, once again putting at risk the secrets of U.S. intelligence agencies and the lives of its personnel and assets.

## II.     The Weight of the Evidence Against Ma is Substantial

The second factor – the weight of the evidence against Ma – strongly supports detention.  As mentioned above, the volume of evidence against Ma is overwhelming.  The cornerstone piece is a videotape of the March 26, 2001 meeting among Ma, his co-conspirator, and several MSS intelligence officers.  The video and audio clearly show the conspirators communicating national defense information to individuals they knew were representatives of a foreign government, and also depicts Ma counting out the $50,000 in cash the conspirators received from the MSS.  (Dkt. No. 1 ¶ 21; *see also, id.* Ex. A.)  Ma, in a post-arrest interview with the FBI, admitted that the video was an accurate depiction of a meeting at which he recalls helping his co-conspirator communicate classified information to the MSS.

The government's evidence includes years of communications, phone conversations, and covert emails between Ma and his MSS handlers.  These communications show Ma accepting taskings, providing identities of suspected human sources, arranging operational travel, and discussing payment for espionage, among other things.  Also, throughout Ma's time in the employment of the FBI, the

FBI gathered evidence of Ma's ongoing attempts to access classified information that he could provide to the MSS, including among other things Ma photographing documents he was asked to translate, burning images onto a CD-ROM disc, photocopying documents containing classification markings, and inserting digital storage devices into his FBI computer.

Moreover, Ma himself has admitted to his lengthy efforts at committing espionage on behalf of the PRC.  In two in-person meetings in Spring 2019, Ma told an FBI undercover employee that he had provided valuable U.S. government information on multiple occasions to the MSS.  (Dkt. No. 1 ¶ 72.)  Ma told the undercover – whom he believed was an MSS officer – that he was willing to continue to help the MSS, and Ma accepted $2,000 cash as a purported gift of gratitude for the service he had provided the MSS.  (*Id.*)  As recently as last week, Ma again confirmed to the undercover during a video recorded meeting that he had given U.S. information to the MSS, and he again accepted $2,000 cash from someone he believed was representing the MSS.  (*Id.* ¶¶ 73-74.)  When the undercover pressed him as to whether he still had any U.S. information in his possession he exclaimed "I already gave you guys everything."

In sum, the weight of the evidence of Ma's espionage is indisputable and it substantially increases the risk that he would flee to evade trial and conviction. Moreover, the overwhelming evidence of Ma's willingness to pass U.S. government

secrets to the MSS – including offering assistance last year, and telling the undercover last week that he would consider again helping China – means that there are no measures that this Court could put into place that could guarantee that Ma would not again disseminate national defense information that could endanger individuals or our national security as a whole.

### III.  Ma's Background as an Intelligence Officer and Substantial Foreign Ties Make Him a Critical Flight Risk and Considerable Danger to the Country

Ma's history and characteristics also point to a risk of flight and danger to the community.  Ma is hardly your average pretrial defendant.  He worked for the CIA for approximately seven years, including as an officer stationed overseas.  As part of his CIA training in the conduct of intelligence activities, Ma was taught "methods of covert communication, surveillance detection, and operational security."  (Dkt. No. 1 ¶ 4.)  Ma is trained on tactics of covert movement and travel.  He was trained to perform in a covert role for one of the world's preeminent intelligence services and the Government submits Ma could easily evade even the most stringent of pretrial conditions.  Thus, in addition to the substantial incentive to flee, Ma also possesses the skills and tradecraft to do so successfully.

Ma was born in Hong Kong and speaks several dialects of Chinese.  His wife also was born in China.[1]  Ma and his wife own two homes in China, one of which is

---

[1] Ma's current wife, Amy Ma, will likely be a proposed candidate for third-party custodian in the event this Court orders Ma released.  The Government asserts that

managed by Ma's wife's parents.  Ma was previously married, and his ex-wife and

an adult daughter from that marriage (an attorney) live in Hong Kong.  Ma worked in

the East-Asia and Pacific region during his CIA career, and he lived in Shanghai

before coming to Hawaii.  He has, or had at one time, a bank account in Hong Kong

into which he requested the MSS deposit money for him.  He does not have extensive

assets in the United States, nor does he have strong family or community ties.

Rather, Ma could easily restart his life with his family in China, or in any other

country that, like China, does not have an extradition treaty with the United States.

In addition, Ma has an extensive history of international travel, including

consistently visiting Asia on an annual basis, and as recently as last autumn.  Just the

last ten years of Ma's travel include the following trips:  September 2019 (Shanghai,

PRC); November 2018 (Taipei, Taiwan); November 2017 (Shanghai); August 2017

(Beijing, PRC); July 2017 (Seoul, South Korea); December 2016 (Shanghai); August

2016 (Tokyo, Japan); December 2015 (Shanghai); July 2015 (Tokyo); June 2014

(Tokyo); June 2012 (Seoul); January 2011 (Manila, the Philippines); June 2010

(Tokyo); and March 2010 (Seoul).

//

---

she would be unsuited to that role.  In addition to her own connections to China
described above – she was born there and her parents live there now – Amy Ma was
involved in some of the alleged conduct:  she met one or more of Ma's MSS handlers
in China in 2006 when she traveled there and delivered an encrypted laptop computer
to them.  (Dkt. No. 1 ¶¶ 47-48.)

This travel history clearly demonstrates that Ma has the resources and familiarity to travel to Asia, either to flee from prosecution, commit acts of espionage, or both.  Once he departs the United States, the Government is likely to lose track of him.  For example, in March 2010, Ma boarded a flight from Honolulu to Seoul, South Korea.  (Dkt. No. 1 ¶ 62.)  When he boarded his flight, he had in his possession two documents that he had improperly removed from the secure FBI workspace, one of which included the U.S. classification marking of SECRET.  (*Id*.)  Two days after returning to Honolulu from Seoul, Ma emailed his MSS handlers requesting reimbursement for "business expenses."  (*Id*. ¶ 63.)   Therefore, the Government contends that Ma either met with the MSS in Seoul or, more likely, took an onward flight into China to meet with his handlers before returning to Seoul.

All of these characteristics also make Ma a considerable danger to the community.  Ma has shown a repeated willingness to disclose information that could damage our national security, and would no doubt have opportunities to do so again, either to China, the country to which he has already sold secrets, or to any other foreign government willing to pay Ma or grant him safe harbor.  It is impossible for the Government to determine what other classified information Ma possesses or has knowledge of, but it is safe to assume that with his life or freedom on the line he would be willing to expose it.  In short, no combination of conditions could prevent a trained spy with foreign intelligence connections from evading pretrial services.

10

## IV.   Ma's Release Would Pose Acute and Specific Dangers to Our National Security

The final factor to be considered in assessing both risk of flight and the safety of the community is the nature and circumstances of the danger that would be posed by Ma's release.  Here, as discussed above, Ma poses a very specific risk both to individual persons and the community at large.  He and his co-conspirator have combined for over two decades of employment as officers of the CIA.  The amount of national security secrets they acquired over time is virtually impossible to count and catalogue.  Based only on the video and audio recordings of the March 2001 meetings among the conspirators and the MSS, the government can show that Ma and his co-conspirator knew the names and covers of CIA officers and assets, the operational tradecraft used by the CIA overseas, including methods of secure communication, and cryptographic information (*i.e.*, how the CIA disguises the contents or significance of its communications).  That information, which was properly classified as confirmed by the CIA, could reasonably be expected to cause serious or exceptionally grave damage to our national security.  In the case of the individuals whose identities Ma and his co-conspirator revealed to the MSS, the danger is acute—they could be captured or killed.

Because Ma obtained decades worth of national defense information, and exhibited a willingness to sell that information to a foreign government, there is no reason to think that he would not do it again.  Indeed, Ma still possessed a number of

documents containing U.S. classification markings in his home as of last week, which the FBI retrieved during the execution of a search warrant issued by this Court.  Ma could have attempted to sell those documents to a hostile government. Even assuming Ma no longer has access to any documents, the Government does not know with certainty what information he has in his head about sensitive government programs, operations, employees or sources.  What is known is that Ma has a strong incentive to leave the jurisdiction, he has value to foreign adversaries, and he has shown no loyalty to the United States.  In fact, he told the undercover agent who he believed to be a Chinese intelligence officer just a few days ago, in a recorded conversation, "I just want to help the motherland."  The Government submits that "the motherland" to which he was referring was not the United States of America. Therefore, Ma poses a very real danger to the country as a whole.

Ma may argue that he poses no actual danger to the national security either because he does not know any classified information that was not already passed to the MSS, or because to the extent he knows anything else as a result of his CIA employment, that information is "stale" in that it has been over 30 years since he was a CIA officer.  However, the undercover operation in 2019 and last week is evidence of Ma's interest in assisting the MSS, and even confirming Ma's past communications of classified information is something of potential value to the MSS. Furthermore, even if Ma already told everything he knew to China that does not

12

mean that his information would not be extremely valuable to other foreign

intelligence services.

## V.     COVID-19 Does Not Alter the Underlying Detention Factors

Ma may raise an additional factor that he believes merits his release from

detention pursuant to conditions:  concerns about the prospect of an uncontained

outbreak of COVID-19 at the Bureau of Prisons ("BOP") facility at which he is

detained, the Federal Detention Center ("FDC") Honolulu.  COVID-19 is a serious

issue facing our community, and an outbreak within FDC Honolulu would be an

understandable concern; however, this is not a sufficient basis to release Ma despite

the risks and dangers he presents as detailed above.

*First*, the BOP has taken strong proactive measures both nationally and locally

to mitigate the spread of COVID-19 within BOP facilities, including FDC Honolulu.

For example, BOP issued directives suspending social and legal visits at all facilities,

curtailing movement, cancelling staff travel and training, limiting access for

contractors and volunteers, and establishing enhanced screening for staff and

inmates.  All facilities were placed on modified operations to maximize social

distancing, including staggered meal and recreation times.  Also, all facilities,

including FDC Honolulu, developed local quarantine and isolation procedures.

Specifically, BOP requires a minimum 14-day medical isolation for all inmates

entering or re-entering BOP facilities for any reason, including routine judicial

13

proceedings.  Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff, while symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting Centers for Disease Control and Prevention ("CDC") criteria for release.

Locally, since March FDC Honolulu has vastly increased its sanitation measures and screening procedures.  For example, all staff members entering FDC Honolulu are being screened for COVID-19 symptoms and must have their temperature taken and documented by a trained staff member wearing personal protective equipment.  The BOP has additional guidance and protocols for any staff who may be symptomatic, including mandatory self-reporting and facility security measures regarding entry in coordination with the medical department.  In addition, all inmates are getting their temperature checked daily as part of the FDC's enhanced medical screening procedures due to COVID-19.

These measures are working.  As of August 18, 2020, FDC Honolulu had **zero** confirmed active cases among inmates, and only one confirmed active case among staff.  *See* "COVID-19 Cases," Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/ (updated daily at 1500 EST; last visited August 18, 2020).  Since the onset of the pandemic, only one inmate at FDC Honolulu has tested positive for COVID-19 and that inmate has recovered.  *Id*. Compared to other federal detention facilities, FDC Honolulu is relatively

14

uncrowded – currently housing 327 inmates out of a capacity of over 750 – which allows for ample bed space and distancing measures in accordance with BOP and CDC guidance.  In short, the danger COVID-19 presents at FDC Honolulu is minimal.

Ma may cite his age (67 years old) or other factors that place him at an increased risk of severe illness should he contract COVID-19.  While that may be true, it would be just as true were he to be placed in home confinement under conditions as it would be were he to be detained at FDC Honolulu where, as mentioned, there currently are no cases of COVID-19.  And if there were any new cases at FDC Honolulu, the facility would be fully able to isolate and protect any higher-risk inmates, given the available excess capacity of the facility.  Under the current circumstances, it is unclear why a BOP facility is any more of a health risk to Ma than the community at large.

*Second*, nothing about the COVID-19 pandemic materially changes the calculus with respect to Ma's risk of flight or danger to the community.  As detailed above, Ma has the incentive, ability, and resources to flee.  While it is true that temporary travel restrictions may make certain types of flight more difficult, there are many methods of transport and countless destinations available to Ma.  Moreover, flight risk is not limited only to physically leaving a jurisdiction; rather, the statute is concerned with whether a defendant can be trusted to "appear[] . . . as

required." 18 U.S.C. § 3142(e)(1). That provision necessarily contemplates a circumstance where a Ma may not ever leave the area, but nonetheless is able to evade law enforcement's ability to monitor his whereabouts. If anything, COVID-19 makes it even more likely that Ma could abscond, with community and law enforcement resources strained by pandemic response and quarantine enforcement. And again, Ma's training in operating in secret would be of great benefit to him.

Likewise, COVID-19 does not affect Ma's risk of danger to the community. As discussed at length above, Ma's harm would involve damage to the national security arising from information contained within his memory that he could convey to an adversary by any means of communication. That is just as true during a pandemic as it is at any time.

## CONCLUSION

The Government respectfully requests that this Court issue an order detaining Ma. The Government submits that detention of Ma pending trial in this matter is the

//

//

//

//

//

//

16

only way to reasonable assure his appearance as required and the safety of others,

including the United States at large due to the national security risk he presents if

released.

DATED:  August 19, 2020, at Honolulu, Hawaii.

KENJI M. PRICE
United States Attorney
District of Hawaii

*/s/ Kenneth M. Sorenson*

By _____
KENNETH M. SORENSON
Assistant United States Attorney

SCOTT A. CLAFFEE
Trial Attorney
U.S. Department of Justice
National Security Division

CERTIFICATE OF SERVICE

I hereby certify that, on the dates and by the methods of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

Served Electronically through CM/ECF:

Craig Jerome, Esq.
Attorney for Defendant
ALEXANDER YUK CHING MA

DATED:  August 19, 2020, at Honolulu, Hawaii.


*/s/ Dawn Aihara*

_____