**ORIGINAL**

KENJI M. PRICE #10523
United States Attorney
District of Hawaii

KENNETH M. SORENSON
Assistant U.S. Attorney
Room 6-100, Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii   96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
E-mail:  ken.sorenson@usdoj.gov

SCOTT CLAFFEE
STEPHEN MARZEN
Trial Attorneys
National Security Division
Counterintelligence and Export Control Section
U.S. Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

SEP 3 0 2020

at___o'clock and___min.__M
MICHELLE RYNNE, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. CR 20 - 00083 DKW |
| | ) | |
| Plaintiff, | ) | INDICTMENT |
| | ) | |
| vs. | ) | [18 U.S.C. §§ 794(a) &(c)] |
| | ) | |
| ALEXANDER YUK CHING MA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

INDICTMENT

The Grand Jury charges:

At all times material to this Indictment, except as otherwise indicated:

## GENERAL ALLEGATIONS

1.      Alexander Yuk Ching MA ("MA"), age 67, was born in Hong Kong and became a naturalized citizen of the United States in 1975.  MA moved to Honolulu, Hawaii, in or about 1968, where he finished primary school and attended the University of Hawaii at Manoa.

2.      MA joined the Central Intelligence Agency ("CIA") in 1982.  In 1983, MA was assigned as a CIA officer overseas.  As a CIA officer, MA held a TOP SECRET security clearance and had access to classified national defense information of the United States.  In addition to his TOP SECRET clearance, MA had access to Sensitive Compartmented Information ("SCI").  This access included the identities of covert CIA officers; the identities of clandestine human sources; details of sensitive intelligence collection operations and methods; details of CIA clandestine training; cryptographic information related to CIA communications; and details of clandestine tradecraft the CIA employs to avoid detection by hostile foreign intelligence services.  As a CIA officer, MA was trained in methods of covert communication, surveillance detection, and operational security, for purposes of conducting authorized intelligence activities for the United States.  In 1989, MA resigned from the CIA.

2

## UNINDICTED COCONSPIRATORS

3.      Co-conspirator #1 ("CC #1"), age 85, not charged herein, was a naturalized United States citizen who resided in Los Angeles, California. CC #1 was born in Shanghai, People's Republic of China ("PRC"), and came to the United States in 1961. CC #1 is related by blood to MA. CC #1 joined the CIA in 1967 and worked as an officer from 1971 to 1982. For multiple years during CC #1's CIA employment, CC #1 was assigned overseas. As a CIA officer, CC #1 held a TOP SECRET security clearance and had access to classified national defense information of the United States. In addition to his TOP SECRET clearance, CC #1 had access to SCI. This access included the identities of covert CIA officers; the identities of clandestine human sources; details of sensitive intelligence collection operations and methods; details of CIA clandestine training; cryptographic information related to CIA communications; and details of clandestine tradecraft the CIA employs to avoid detection by hostile foreign intelligence services. As a CIA officer, CC #1 was trained in methods of covert communication, surveillance detection, and operational security, for purposes of conducting authorized intelligence activities for the United States. In 1983, CC #1 resigned from the CIA. After ending employment with the CIA, CC #1 resided in Los Angeles, California.

4.     Co-conspirator #2 (CC #2), not charged herein, was an intelligence officer and supervisory level official within the Shanghai State Security Bureau ("SSSB"), a provincial-level department operating under the PRC's Ministry of State Security ("MSS").

5.     Co-conspirator #3 (CC #3), not charged herein, was an intelligence officer within the SSSB, and operated as a handler and contact person for MA within the SSSB.

6.     Co-conspirator #4 (CC #4), not charged herein, was a high-level official within the SSSB.

7.     Co-conspirator #5 (CC #5), not charged herein, was an intelligence officer within the SSSB.

8.     Co-conspirator #6 (CC #6), not charged herein, was an intelligence officer within the SSSB, and operated as a handler and contact person for MA within the SSSB.

9.     Co-conspirator #7 (CC #7), not charged herein, was an intelligence officer within the SSSB, and operated as a handler and contact person for MA within the SSSB.

<u>CHINESE INTELLIGENCE SERVICES AND ASSOCIATED TERMS</u>

10.     The PRC intelligence services encompassed both the civilian and military components of Chinese intelligence programs. The MSS handled civilian

4

intelligence collection and was responsible for counterintelligence and foreign intelligence, as well as political security. The MSS consisted of a central ministry, provincial state security bureaus, and municipal state security bureaus. The SSSB was a provincial state security bureau charged with collecting intelligence within the geographic region surrounding Shanghai. Because the SSSB reported directly to the MSS, and was a department thereof, MSS and SSSB will be collectively referred to in this Indictment as the MSS.

11.    Among other things, the MSS was tasked with collecting intelligence information that would be of value to the PRC's political, economic, and national security, and actively recruited human intelligence sources in order to gather intelligence information and state secrets of foreign countries. The MSS operated in part through the use of intelligence officers ("IOs") who focused their attention on conducting clandestine and overt human source operations to gather intelligence information. The United States was a primary target of the MSS intelligence-gathering mission.

<u>THE CENTRAL INTELLIGENCE AGENCY</u>

12.    The CIA was a U.S. government intelligence agency with various offices, and was a component of the United States Intelligence Community. The CIA was responsible for, among other things, collecting (including through clandestine means), producing, and disseminating foreign intelligence and

counterintelligence used to inform U.S. policy makers; conducting

counterintelligence activities; conducting administrative and technical support

activities; conducting covert action activities approved by the President; and

conducting foreign liaison relationships with intelligence and security services of

foreign governments. The collection of foreign intelligence is, in part, done

through the use of sources or assets. Sources or assets are people who agree to

help a foreign intelligence service by providing information to that service in

response to tasking from foreign intelligence officers or agents.

CLASSIFIED INFORMATION

13.    Pursuant to Executive Order 12958 signed on April 17, 1995, as

amended by Executive Order 13292 on March 25, 2003, and Executive Order

13526 on December 29, 2009, national security information was classified as

"TOP SECRET," "SECRET," or "CONFIDENTIAL." National security

information was information owned by, produced by, produced for, and under the

control of the United States government that was classified as follows:

a.    Information was classified as TOP SECRET if the unauthorized

disclosure of that information reasonably could be expected to cause exceptionally

grave damage to the national security that the original classification authority was

able to identify and describe.

b.      Information was classified as SECRET if the unauthorized

disclosure of that information reasonably could be expected to cause serious

damage to the national security that the original classification authority was able to

identify and describe.

c.      Information was classified as CONFIDENTIAL if the

unauthorized disclosure of that information reasonably could be expected to cause

damage to the national security that the original classification authority was able to

identify and describe.

14.    Access to national security information classified at any level could be

further restricted through designation in SCI categories.  Only individuals with the

appropriate security clearance and additional SCI permissions could have

authorized access to such classified national security information.

15.    Information classified at any level could only be lawfully accessed by

persons determined by an appropriate United States government official to be

eligible for access to the classified information and to have a "need to know" the

classified information.  Classified information could only be stored in an approved

facility and container.

<u>SECURITY CLEARANCES</u>

16.    Both MA and CC #1 worked during their CIA careers in the East-Asia

and Pacific region.  Both MA and CC #1 held U.S. security clearances at the TOP

7

SECRET//SCI level and had access to a broad range of highly sensitive classified material.

17.     Because MA and CC #1 held security clearances, the U.S. government entrusted them with access to sensitive government materials, including classified documents and materials, and information relating to the national defense that was closely held by the government.

18.     Throughout their careers, as a prerequisite to their access to classified information, MA and CC #1 signed several nondisclosure agreements in which they acknowledged both the harm that could result from the unauthorized disclosure of classified information and the applicability of criminal penalties should they make in violation of their security oaths disclosures of such information to persons not authorized to receive it.

19.     For example, upon entry into service with the CIA, on or about January 25, 1982, MA signed a Secrecy Agreement that stated, in pertinent part:

> I understand that in the course of my employment or other service with the Central Intelligence Agency I may be given access to information which is classified in accordance with [applicable Executive Orders], and other information which, if disclosed in an unauthorized manner, would jeopardize foreign intelligence activities of the United States Government. I accept that by being granted access to such information I will be placed in a position of special confidence and trust and become obligated to protect the information from unauthorized disclosure.

* * *

Further, I understand that the disclosure of information which I have agreed herein not to disclose can, in some circumstances, constitute a criminal offense.

### Conspiracy to Gather or Deliver National Defense Information To Aid a Foreign Government (18 U.S.C. Section 794(a) & (c))

20.    Paragraphs 1-19 of the General Allegations section of this Indictment are incorporated herein by reference and re-alleged as though set forth fully herein.

21.    From a precise date unknown, but by at least March 2001, and continuing to in or about November 2010, within the District of Hawaii and elsewhere, ALEXANDER MA, the defendant, along with CC #1 (not charged herein), CC #2 (not charged herein), CC #3 (not charged herein), CC #4 (not charged herein), CC #5 (not charged herein), CC #6 (not charged herein), and CC #7 (not charged herein), did knowingly and intentionally conspire, confederate, and agree with each other and other persons, both known and unknown to the Grand Jury, with the intent and reason to believe that it was to be used to the injury of the United States and to the advantage of a foreign nation, to communicate, deliver, and transmit to a foreign government, that is, the Government of the People's Republic of China, and its representatives, officers, agents, employees, subjects, and citizens thereof, directly and indirectly, documents, writings, and information relating to the national defense of the United States, including information directly concerning cryptographic information.

9

## MANNER AND MEANS OF CONSPIRACY

22.    It was a part of the conspiracy that MA and CC #1 would meet in Hong Kong with intelligence officers (IOs) of the PRC over the course of three days in March 2001. These meetings were an opportunity for, among other things, MA and CC #1 to provide classified national defense information of the United States to IOs of the MSS. The IOs present at the meeting included, but were not limited to, CC #2, CC #3, CC #4, and CC #6.

23.    It was a further part of the conspiracy that the MSS would pay MA and CC #1 the sum of $50,000 in U.S. currency on the third day of their March 2001 meetings.

24.    It was a further part of the conspiracy that following the March 2001 meetings in Hong Kong, MA and CC #1 would continue to provide classified national defense information of the United States to MSS IOs in return for cash and other gifts.

25.    It was a further part of the conspiracy that MA, in order to again gain access to U.S. classified national defense information and remain valuable to the MSS, would seek to obtain employment with the Federal Bureau of Investigation ("FBI") first as an FBI Special Agent and later, when rejected for that position, as a contract linguist in Chinese languages.

26.    It was a further part of the conspiracy that upon obtaining employment with the FBI in or about August 2004, MA would attempt to use his access to a secure FBI workspace to gather and steal classified U.S. national defense information in order to deliver it to his MSS handlers.

27.    It was a further part of the conspiracy that following the FBI's hiring of MA as a contract linguist in Honolulu, Hawaii, the MSS would provide MA with equipment for the purpose of gathering U.S. classified national defense information, and other sensitive government materials, and communicating such information and materials to his MSS handlers.

28.    It was a further part of the conspiracy that MSS handlers would establish and use an unattributed e-mail account for the purpose of facilitating covert communications between themselves and MA.

29.    It was a further part of the conspiracy that the MSS tasked MA to solicit CC #1 to provide the MSS with the identities of suspected human sources with whom CC #1 had worked while employed as a CIA case officer.

30.    It was a further part of the conspiracy that CC #1 would provide MA identity information on suspected human sources for delivery to MSS IOs.

31.    It was a further part of the conspiracy that MA would photograph and copy documents with classification markings that had been entrusted to him, or

11

which he had gained unauthorized access to, and at times depart with them in his possession when he exited the secure FBI workspace.

32.     It was a further part of the conspiracy that MA would, without authorization and in violation of FBI policy, insert digital storage devices into computers marked for processing and storage of classified information located in the secure FBI workspace in an attempt to gather U.S. national defense information and other sensitive U.S. government materials for delivery to the MSS.

33.     It was a further part of the conspiracy that MA would make periodic trips to the PRC and elsewhere for the purpose of meeting with the MSS and providing them with information and documents that he had gathered.

34.     It was a further part of the conspiracy that MA did purposefully fail to include the cash payments and other financial benefits he received from China for spying on their behalf when reporting his income to United States taxing authorities.

OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, MA and his coconspirators committed the following overt acts in the District of Hawaii and elsewhere, including, but not limited to, the following:

35. On or about March 24, 2001, MA and CC #1 met with at least four members of the MSS in a Hong Kong hotel room. This meeting included CC #2, CC #3, CC #4, and CC #6.

36. On or about March 25 and 26, 2001, MA and CC #1 met again in the same Hong Kong hotel room with MSS officers CC #2, CC #3, CC #4, and CC #6.

37. Over the course of the above-referenced three days (collectively referred to below as "Meeting l"), MA and CC #1 provided classified national defense information of the United States to the MSS including, but not limited to:

    a.    CIA work experience and activities;

    b.    Information concerning CIA international operations, including the cover used by CIA officers and CIA activities;

    c.    Cryptographic information used in classified and sensitive CIA communications and reports;

    d.    Information concerning the internal structure and organization of the CIA;

    e.    Information concerning CIA officer identities;

    f.    Information concerning CIA human assets;

    g.    Information concerning CIA use of operational tradecraft;

    h.    Information concerning CIA technical departments;

      1.     Information concerning CIA secure communication practices; and

      j.     Information concerning CIA staffing practices.

38.    During Meeting 1, MSS officers paid MA and CC #1 $50,000 in U.S. currency, which MA counted while CC #1 continued to provide classified information to the MSS officers attending the meeting.

39.    On or about December 26, 2002, in order to once again give himself access to U.S. government information, MA submitted a job application for an FBI Special Agent position to the FBI Honolulu Field Office.

40.    On or about December 30, 2002, after being advised by the FBI that he did not meet the age requirements for the FBI Special Agent position, MA submitted an on-line job application to the FBI for a "contract linguist/monitor/tester" position.

41.    On or about April 14, 2003, MA submitted a written application for a contract linguist position, in Chinese languages, at the FBI Honolulu Field Office, in Honolulu, Hawaii.

42.    On or about April 21, 2003, MA used a prepaid calling card to call CC #2 and CC #3 to notify them of the status of his efforts to gain FBI employment.

43.    On or about May 5, 2003, MA told Jane Doe, a person whose identity is known to the Grand Jury, by telephone about his FBI job application and advised

her that he would have to undergo a background investigation in order to be hired by the FBI.

44.    On or about March 27, 2004, CC #1 in a telephone conversation with Jane Doe discussed how to answer questions during, and with regards to, MA's FBI background investigation.  During the conversation, CC #1 told Jane Doe, "[W]e all have to start spying."

45.    On or about May 20, 2004, MA was notified that his background investigation for the contract linguist position was complete and that an employment contract would be ready for review in several weeks.  MA agreed to continue the hiring process.

46.    On or about August 10, 2004, one day before reporting to work with the FBI, MA telephoned Jane Doe and told her that he would be working for "the other side."

47.    On or about August 11, 2004, MA reported to work with the FBI to begin employment and acknowledged with his signature on an FBI nondisclosure agreement his understanding of the secrecy requirements of his employment with the FBI, including secrecy concerning his FBI work product and materials provided to him.  The nondisclosure agreement specifically cautioned him that federal criminal laws prohibited the unlawful gathering and disclosure of such materials.  In the nondisclosure agreement, MA acknowledged, "I understand the

15

need for this secrecy agreement; therefore, I agree that I will never divulge, publish, or reveal either by word or conduct, or by other means of disclosure, to any unauthorized recipient without official written authorization by the Director of the FBI or his delegate, any information from the investigatory files of the FBI or any information relating to material contained in the files, or disclose any information or produce any material acquired as a part of the performance of my contract ... ."

48.    On or about August 11, 2004, during a security briefing the FBI conducted with MA, the FBI advised MA that because he was working in a controlled security environment designed for the storage of classified materials, he could not use any personal devices, including laptop computers, cellular telephones, personal digital assistants, digital cameras, or removable media, to perform his duties, including translating materials or storing FBI information. Additionally, the FBI instructed MA that he was never to remove any document or digital material from the secure FBI workspace.

49.    On or about September 8, 2004, while working in the secure FBI workspace, MA used his assigned FBI computer to "burn" onto a CD-ROM disc digital photographic images of documents related to guided missile and weapons system technology research.

50.     On or about July 27, 2005, in violation of FBI policy and the security protocols upon which he had been instructed, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

51.     On or about August 18, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

52.     On or about August 22, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

53.     On or about August 26, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

54.     On or about September 6, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

55.     On or about September 12, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

56.     On or about September 16, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

57.     On or about October 3, 2005, MA brought a digital camera into the secure FBI workspace and photographed translation documents.

58.     In or about February 2006, MA exchanged several e-mail messages and phone calls with MSS IOs.  In the exchanges, they discussed MA's upcoming

travel plans to Shanghai in late February 2006.  The MSS officers told MA they would book MA's hotel and pick him up from the airport.

59.     On or about February 17, 2006, MA departed Honolulu, Hawaii, for Shanghai, PRC via Narita International Airport in Tokyo, Japan.

60.     On or about February 23, 2006, MA returned to the Honolulu International Airport, arriving from Tokyo following his travel in Shanghai. During Customs screening, U.S. Customs and Border Protection ("CBP") agents interviewed and searched MA.  During the interview, CBP determined that MA was in possession of $20,000 in U.S. currency.  In addition, MA had a set of golf clubs he did not previously own.

61.     On or about February 23, 2006, MA forwarded two e-mail messages from his personal e-mail account to the MSS.  The first e-mail message contained information regarding classified CIA activities.  The second e-mail message was an e-mail message MA had received from a Taiwanese diplomatic official.

62.     On or about February 27, 2006, MA sent CC #1 an e-mail message to advise CC #1 that MA had sent to CC #1 photographs of suspected human sources that MSS operatives wanted CC #1 to identify.

63.     On or about March 2, 2006, MA telephoned CC #1 at the request of the MSS to inquire with CC #1 as to the identities of the persons in the photographs sent to MA by the MSS, which MA in turn sent to CC #1.  CC #1

18

agreed to provide MA and the MSS with the identities of the individuals in the photographs.

64.     On or about March 6, 2006, MA received an e-mail message from the MSS with an attachment consisting of one photo of five (5) puppies sitting on a park bench.

65.     On or about March 16, 2006, MA possessed at his residence a digital memory card with photographs of five (5) individuals, one (1) picture of a piece of paper with names written in Chinese labeled "a" through "e," and eight (8) photographs of a document that had been removed from the secure FBI workspace.

66.     On or about March 28, 2006, CC #1 sent an e-mail message to MA wherein CC #1 identified two (2) of the five (5) individuals depicted in the photograph provided by the MSS.

67.     On or about May 31, 2006, MA arranged for his wife to fly to Shanghai, PRC.  During this trip, MA's wife delivered a laptop computer to MA's contacts within the MSS.

68.     On or about June 10, 2006, CC #3 sent MA an e-mail message thanking him for sending his wife and delivering "the present."

69.     On or about June 16, 2006, MA departed Honolulu for Hong Kong for the purpose of meeting with his MSS handlers.

19

70.    On or about July 15, 2006, MA returned to Honolulu from China and declared $7,000 in U.S. currency to CBP at the Honolulu International Airport.

71.    On or about May 2, 2007, MA photocopied and removed copies of translation documents from the secure FBI workspace.

72.    On or about October 24, 2007, MA photocopied and removed copies of translation documents from the secure FBI workspace.

73.    On or about March 27, 2008, MA photocopied and removed copies of translation documents from the secure FBI workspace.

74.    On or about May 8, 2008, MA photocopied and removed copies of translation documents from the secure FBI workspace.

75.    On or about June 2, 2008, CC #7 telephoned MA and said his "company" would have a lot of work orders that year.

76.    On or about August 15, 2008, CC #7 telephoned MA and reminded MA to call him if a "good" opportunity arose.

77.    On or about February 3, 2009, MA photographed and removed documents with classification markings from the secure FBI workspace and removed copies of translation documents from the secure FBI workspace.

78.    On or about April 21, 2009, MA photocopied and removed documents with classification markings from the secure FBI workspace.

79.     On or about December 2, 2009, during a telephone conversation, CC #1 told MA that CC #1 had met with an MSS contact in Yunan, China during a recent trip to China.

80.     On or about January 14, 2010, MA photographed documents in the secure FBI workspace with his cellular phone.

81.     On or about March 6, 2010, CC #7 telephoned MA to discuss meeting in Hong Kong in late March.  Approximately one (1) hour after this call, CC #7 telephoned MA again, and they confirmed MA's travel schedule to Hong Kong. CC #7 advised MA that his "leadership" was eager to meet MA.

82.     On or about March 9, 2010, MA called his wife and told her he had to travel to Hong Kong on behalf of his "boss" in late March 2010.

83.     On or about March 17, 2010, MA boarded a flight from Honolulu bound for Hong Kong.  In his checked luggage for the trip, MA possessed a document with U.S. classification markings that MA had taken from the secure FBI workspace.  In addition, MA possessed a Chinese language document that he had improperly removed from the secure FBI workspace.

84.     On or about March 29, 2010, MA returned to Honolulu by way of Seoul, South Korea.

85.     On or about March 31, 2010, MA sent one of his MSS handlers an e-mail message requesting "reimbursement" for "business expenses."  MA provided the bank account number at a Hong Kong bank for payment purposes.

86.     On or about May 17, 2010, MA received a telephone call from CC #7. During the ensuing conversation, CC #7 apologized for not seeing MA during MA's recent travel to China and extended an invitation to meet in Shanghai in the future.  During the call, CC #7 told MA he should communicate with CC #1 more often and determine if CC #1 would be willing to discuss their "business venture."

87.     On or about May 19, 2010, MA sent CC #7 an e-mail message telling CC #7 he needed money when he was next in Hong Kong.

88.     On or about August 28, 2010, MA received a telephone call from CC #7 wherein CC #7 inquired how "business" was going.  During the conversation, CC #7 invited MA to visit with CC #7 in Shanghai, preferably in March 2011.

89.     On or about November 2, 2010, MA inserted a digital storage device into his FBI computer at the secure FBI workspace.

90.     On or about November 23, 2010, MA inserted a digital storage device into his FBI computer at the secure FBI workspace.

91.     On or about November 30, 2010, MA inserted a digital storage device into his FBI computer at the secure FBI workspace.

All in violation of Title 18, United States Code, Sections 794(a) & (c).

DATED:  September 30, 2020, at Honolulu, Hawaii.

A TRUE BILL

/s/ Foreperson
FOREPERSON, GRAND JURY

_____
KENJI M. PRICE
United States Attorney
District of Hawaii

_____
KENNETH M. SORENSON
Assistant U.S. Attorney
District of Hawaii

_____
SCOTT CLAFFEE
Trial Attorney
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice

_____
STEPHEN MARZEN
Trial Attorney
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice

United States v. Alexander Ma
Indictment
Cr. No.    CR 20 - 00083   DKW

23